UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYAN JOHNSON, an individual,<br><br>                       Plaintiff,<br><br>v.<br><br>RADFORD PAJITA, an individual;<br>CHRIS BLOMBERG, an individual;<br>CITY OF SAN DIEGO, a government entity,<br><br>                       Defendants. | Case No.: 3:15-cv-01039-H-JLB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>[Doc. No. 151] |

On February 14, 2017, the Court commenced a jury trial on Plaintiff Bryan Johnson's excessive force civil rights claim against police officers Radford Pajita and Chris Blomberg. At the close of Plaintiff's case in chief, Defendants timely moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). (Doc. No. 151.) While the motion was under submission, the jury informed the Court that all jurors favored Defendants except for one holdout juror. The Court declared a mistrial on February 24, 2017. (Doc. No. 154.)

On May 12, 2017, the Ninth Circuit published an opinion in S.B. v. Cty. of San Diego, --- F.3d ---, 2017 WL 1959984 (9th Cir. May 12, 2017). That opinion provided additional guidance on the issue of qualified immunity. On May 16, 2017, the Court

ordered the parties to supplement their Rule 50 briefing to address the issue of qualified immunity in light of the S.B. case. (Doc. No. 180.) The Court also directed the parties to address the remaining state law claims. (Id.)

On June 15, 2017, Defendants Pajita and Blomberg filed supplemental briefing on their Rule 50 motion, asking for judgment on the federal excessive force claim and the state law negligence claim. (Doc. No. 181.) Plaintiff Johnson filed a response on July 16, 2017, and Defendants filed a reply on July 21, 2017. (Doc. Nos. 182, 185.) On July 27, 2017, the Court held a hearing on the motion. Estevan R. Lucero appeared for Plaintiff Johnson and Beverly Anne Roxas appeared for Defendants Pajita, Blomberg, and the City of San Diego.

For the reasons that follow, the Court grants the Rule 50 motion as to the federal excessive force claim and the state law negligence claim. Given that no federal claim remains, the Court declines to exercise jurisdiction over the remaining state law claims for battery and intentional infliction of emotional distress.

## Background

This case involves a private citizen, Plaintiff Johnson, tackling an individual on a bicycle who turned out to be an undercover police officer. Plaintiff Johnson and the officer, Defendant Pajita, both went to the ground and Johnson sustained a cut to the head. Following the trial, Defendants renew their request for qualified immunity and seek judgment on Johnson's negligence claim.

On January 29, 2015, Defendant Pajita was working undercover with a team trying to catch bicycle thieves. (Doc. No. 171 at 138.) His role was to radio his colleagues if he witnessed a theft and follow the suspect, while maintaining his cover, to direct his uniformed colleagues to make an arrest. (Id. at 140-42.) Officer Pajita had just witnessed such a theft, and he was following a suspect—both he and the suspect were on bicycles. (Id. at 159.) Officer Pajita had already contacted his uniformed colleagues, and one uniformed officer was pursing the suspect on foot. (Doc. No. 172 at 82-83.)

The suspect chose to flee the uniformed officer on the stolen bicycle. (Id.) In order to stop the suspect while maintaining his cover, Officer Pajita rode past him and gave him

a slight push just above the right elbow. (Doc. No. 171 at 180-82.) Officer Pajita intended to re-direct the suspect's handlebars in order to force him to put his foot down. (Id.) According to Officer Pajita, the suspect did stop, put his foot down, and was then arrested by the uniformed officer. (Id.) The arresting officer confirmed that Officer Pajita gave the fleeing suspect a push, causing the suspect to lose his balance and allowing him to be caught. (Doc. No. 172 at 83:19-21.)

Officer Pajita watched the suspect as he rode past him. (Doc. No. 171 at 183:19-23.) Officer Pajita then brought his attention forward to focus on his own bicycle's path. (Id.) In a "split second," he saw "two hands attacking [him]." (Id.) All the officer knew at that point was that the attacker was white, bald, and wearing a blue sweatshirt. (Id. at 184.) The attacker swung Officer Pajita around. (Doc. No. 172 at 48.) As he was being swung around, Officer Pajita struggled to gain control of the attacker. (Id.) The officer testified that he felt overpowered while he was being spun around. (Id. at 48:3-5.) He thought he was being attacked by an accomplice of the fleeing suspect. (Doc. No. 171 at 175:15-16.) After spinning around, both the attacker and Officer Pajita fell to the ground. (Doc. No. 172 at 48:5-8.) According to Officer Pajita, he landed by the attacker's feet, facing the attacker. (Id. at 48:8-9.) He testified that the attacker was facing up with his back on the ground. (Id. at 10:15-16.) Officer Pajita then moved up towards the attacker's face and rolled him over onto his stomach to gain control of him. (Id. at 48:10-20.)

The attacker was Plaintiff Johnson. Johnson had seen two bicyclists being followed by police, so he assumed both bicyclists were fleeing suspects. (Doc. No. 171 at 63.) Johnson attempted to help the police by stopping the first cyclist. (Id. at 65:22-25.) Johnson testified that he waited by his car until the bicyclists were close before stepping forward to grab the leading cyclist. (Id. at 90-91.) Johnson admitted that his actions were a "surprise tactic." (Id. at 91:4-6.) The defense's biomechanics expert testified that Officer Pajita only had 750 milliseconds to react to Johnson. (Doc. No. 174 at 128:12-20.)

During a prior deposition, Johnson testified that he grabbed the bicyclist by the collar, tried to bring him down, got turned around, and then ended up flat on the ground.

(Doc. No. 171 at 104-07.) In that deposition, Johnson only referenced going to the ground one time. (Id.) But at trial, Johnson testified that he stood up on his own and was taken down a second time.[1] (Id. at 67:2-9.) Officer Pajita testified that Johnson only got up from the ground once—when he was helped up by the two defendant officers. (Doc. No. 172 at 5:16-17.)

Both sides played footage from a nearby security camera during the trial. (Defendants' Exhibit E; Plaintiff's Exhibits 2-9.) The video showed Johnson pull Officer Pajita from a bicycle. The two individuals then spun around towards the door of the restaurant, rotating as they fell, but the camera panned away without capturing the rest of the scene. When the camera panned back to the scene, it showed Johnson being helped up by Officer Blomberg, who was in his police uniform, and Officer Pajita, who was dressed in dark clothes for his undercover role.

A witness inside the restaurant, Luis Crespo, stated that somebody was struggling with Johnson and threw him to the floor. (Doc. No. 171 at 201:16-20.) The witness did not see Johnson get up from the ground before he was thrown. (Id. at 203:6-8.) The witness stated that the person who threw Johnson was not a uniformed police officer. (Id. at 205:24-25 to 206:1.) The witness did not see a uniformed police officer arrive until a few seconds after Johnson hit his head. (Id. at 206:2-4.)

At some point, Johnson sustained a cut to the right side of his head, although Johnson did not know how he acquired the injury. (Id. at 69:4-5.) Johnson's forensic consultant testified that Johnson was likely cut while falling backwards against a sharp piece of metal trim on the outside of the restaurant. (Doc. No. 173 at 54:17-21.) Defendants' biomechanics expert pointed to the video, opining that Johnson was rotating in the entire video, exposing the right-hand side of his head to the restaurant's wall. (Doc. No. 174 at 156:14-17.)

---

[1] This is similar to the "sham affidavit" situation in the summary judgment context. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by . . . contradicting his prior deposition testimony." Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009) (quoting Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991)).

After Officer Pajita rolled Johnson onto his stomach, he put one knee on Johnson's lower back and one knee on the side of Johnson's buttocks. (Doc. No. 171 at 186:1-3.) He grabbed Johnson's left hand and placed it on the small of Johnson's back. (Id. at 185:23-24.) Officer Blomberg then arrived at a run and assessed the situation. (Id. at 186.) He testified that Johnson and Officer Pajita were still struggling when he arrived—Johnson was already on his stomach, and Officer Pajita was on top of him over his buttocks, trying to put Johnson's hands behind his back. (Doc. No. 173 at 34.) After taking control of the situation, Officer Blomberg helped Johnson sit up and helped him stop the bleeding from his head using Johnson's sweatshirt. (Doc. No. 171 at 189-90.) Officer Blomberg testified that he did not use any force on Johnson. (Doc. No. 173 at 35:22-23.)

## Discussion

### I. Legal Standards

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Under Rule 50(a)(1),

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

In deciding a motion under Rule 50(a), the Court reviews all of the evidence and draws all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The Court is not permitted to make credibility determinations or weigh the evidence. Id. The salient inquiry is whether the evidence "permits only one reasonable conclusion." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).

## II. Analysis

### A. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. (Doc. No. 181 at 4-6.) "Qualified immunity shields a police officer from suit under § 1983 unless (1) the officer violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct." Thomas v. Dillard, 818 F.3d 864, 874 (9th Cir. 2016), as amended (May 5, 2016) (citations omitted). The Court has discretion to determine which of these two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011).

The Court first turns to whether the asserted constitutional right was clearly established at the time of the officers' alleged misconduct. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," especially in the Fourth Amendment context, where "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. (citations and internal quotation marks omitted). Put another way, only the "plainly incompetent" officer will not enjoy qualified immunity. Id. (citation omitted).

The Supreme Court and the Ninth Circuit have both published recent opinions providing additional guidance on the "clearly established" standard. See White v. Pauly, 137 S. Ct. 548 (2017); S.B. v. Cty. of San Diego, --- F.3d ---, 2017 WL 1959984 (9th Cir. May 12, 2017). In White, the Supreme Court noted that it has recently reversed a number of federal courts in qualified immunity cases. White, 137 S. Ct. at 551. Thus, the Court found it "again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" Id. at 552 (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case. Id. (quoting Anderson, 483 U.S. at 640).

In S.B., the Ninth Circuit applied White to a case where an intoxicated man was shot and killed by police. S.B., 2017 WL 1959984 at *2-*3. The man was on his knees with knives sticking out of his pockets. Id. at *2. Three officers were in the room, and the man started reaching for a knife. Id. at *2-*3. One of the officers fired his weapon, killing the man. Id. The officers' testimony differed regarding: 1) whether the man was attempting to stand while drawing the knife, 2) the distance between the man and one of the officers, and 3) whether the officer who fired could see the other officers clearly when he shot the intoxicated man. Id. at *3. The district court determined that these inconsistencies created a triable dispute over whether the officer's conduct violated clearly established law, but the court did not identify a clear precedent barring the officer from using deadly force under the circumstances. Id.

The Ninth Circuit reversed the district court, explaining that the court must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." Id. at *6 (quoting White, 137 S. Ct. at 552). The Ninth Circuit could not find such a case, and the court determined that the shooting was not an "obvious" or "run-of-the-mill" constitutional violation. Id. at *7. The officer was therefore entitled to qualified immunity. Id. at *6-*7.

Here, Plaintiff has similarly failed to identify a case where an officer, acting under similar circumstances, was held to have violated the Fourth Amendment. Johnson used a "surprise tactic" on Officer Pajita, giving the officer less than a second to react before being pulled off the bicycle. (Doc. Nos. 171 at 91:4-6, 183:19-23; 174 at 128:12-20.) The officer thought he was being attacked by an accomplice of the fleeing suspect. (Doc. No. 171 at 175:15-16.) During the encounter, Johnson's head hit the metal trim, and Johnson was placed on his stomach with Officer Pajita kneeling on him to subdue him. (Doc. No. 173 at 54:17-21; 171 at 185-86.) The Court has located no case in which an officer in similar circumstances was held to have violated the Fourth Amendment.

Likewise, the Court has located no case indicating that Officer Blomberg violated a clearly established right. There was no evidence at trial that Officer Blomberg used any

1  force. Blomberg testified that he did not apply force on Johnson. (Doc. No. 173 at 35:22-
2  23.) No witness testified to seeing him use any force—even Johnson did not say that he
3  saw Officer Blomberg apply force.

4  　　　Johnson argues that the witness inside the restaurant saw Officer Blomberg use a
5  wrestling move on Johnson. (Doc. No. 182 at 6.) But to the contrary, the witness's
6  testimony indicates that Officer Blomberg did not arrive until after Johnson hit his head.
7  The witness testified that Johnson struggled with a man who was not in uniform. (Doc. No.
8  171 at 205-206.) Officer Pajita was not wearing a uniform because he was undercover. The
9  witness then testified that Johnson hit his head before a uniformed officer arrived. (Id.)
10 Officer Blomberg was wearing a uniform. The following testimony was given at trial:

11 　　　Q: The person that you saw throw Mr. Johnson you did not believe was a
12 　　　　　police officer, correct?
13 　　　A: No. He was dressed in black.
14 　　　Q: And you didn't see a police officer arrive until after he hit his head, is
15 　　　　　that right?
16 　　　A: A few seconds after.
17 　　　Q: And you saw that police officer coming from a police car?
18 　　　A: That is correct, parked on the corner of the restaurant.
19 　　　Q: And is that the corner of Park Boulevard and 10th Avenue?
20 　　　A: That's correct.
21 　　　Q: And his car was parked on Park Boulevard?
22 　　　A: Yes. Yes, it was on Park Boulevard.
23 　　　Q: And that officer got out of his car, correct?
24 　　　A: Yes.
25 　　　Q: And you saw him run to the scene?
26 　　　A: That's correct.
27 　　　Q: And that's the first officer you saw?
28 　　　A: That was -- that was the first one that I saw arrive. Later others arrived.

(Id.) Officer Blomberg testified that he parked his car on Park Boulevard, approached the scene, and saw Officer Pajita already placing Johnson's hands behind his back. (Doc. No. 173 at 40:14-22, 41:8-10, 45:9-11.) Thus, the witness's testimony corroborates Officer Blomberg's testimony, not the story Johnson tells in his briefing papers.

Johnson also argues that Officer Pajita used excessive force by using a knee-pin control technique while Johnson was on the ground. (Doc. No. 182 at 4.) Officer Pajita testified that after he and Johnson fell to the ground, he put Johnson on his stomach, put Johnson's hand behind Johnson's back, and placed his knees onto Johnson's back and buttocks. (Doc. No. 172 at 30:13-16.) Johnson argues that this force was excessive given that Johnson was purportedly compliant at this time. (Doc. No. 182 at 4.) But Officer Pajita testified that he and Johnson were still struggling when they first went to the ground. (Doc. No. 172 at 15:5-12.) Johnson confirmed Officer Pajita's testimony, stating that he and Pajita "wrestled." (Doc. No. 171 at 88:18-20.) Officer Blomberg also confirmed that Johnson and Pajita were struggling while on the ground. (Doc. No. 173 at 34.) Officer Pajita testified that he believed it was appropriate to gain control of Johnson given that he had just been attacked and thought the attacker was an accomplice of the original suspect. (Doc. No. 172 at 32:21-25.)

Johnson relies heavily on his assertion that he was taken down a second time. (See, e.g., Doc. No. 182 at 8.) But the record does not support Johnson's theory of a second takedown. The video does not show a second takedown. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) (courts "should . . . view[] the facts in the light depicted by the videotape"). Conveniently, Johnson testified that he hit the wall during a second takedown when the video panned away from the scene. (Doc. No. 171 at 83:6-13.) But this testimony contradicts Johnson's prior deposition testimony that he only stood up once. (Doc. No. 171 at 104-07.) C.f. Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by . . . contradicting his prior deposition testimony."). Johnson's new testimony also contradicts the witness inside the restaurant, who did not testify to two takedowns. (Doc. No. 171 at

205-06.) The witness testified that Johnson was standing while struggling with the person who took him down, and the witness did not see Johnson get up from the ground before that struggle. (Id. at 203:1-8.) The witness also testified that Johnson hit his head a few seconds before the first uniformed officer arrived at the scene. (Id. at 206:2-4.) Based on the security footage, it is clear that Officer Blomberg arrived at the scene a few seconds after the camera panned away. Thus, the video and the witness's testimony contradict Johnson's assertion that he was taken down a second time while the camera had panned away.

In order to support his theory that he was taken down a second time, Johnson argues: 1) the left side of his head was facing the wall the first time he purportedly went down, and 2) the injury was to the right side of his head. (Doc. No. 182 at 5.) Again, Johnson's argument is not supported by the trial record. Johnson cites Officer Pajita's testimony to argue that the left side of Johnson's head was facing the wall when he fell down. (Id.) But Johnson mischaracterizes Officer Pajita's testimony.[2] The officer clearly testified that Johnson was facing up when he first fell to the ground. (Doc. No. 172 at 10:12-16.) If he was facing up—in other words, if he landed on his back—then the right side of his head would have been facing the wall. Johnson's injury was on the right side of his head, so the injury corroborates Officer Pajita's testimony. Moreover, Johnson himself testified that he did not know which way he was facing when he went to the ground. (Doc. No. 171 at 70:12-18.) Thus, Johnson's own testimony does not support his theory that his left side was facing the wall when he fell down.

Johnson also argues that he was trying to walk away when he was allegedly taken down a second time. (Doc. No. 182 at 8:4-6.) But he does not cite any portion of the trial record to support his argument that he tried to walk away. (Id.) Indeed, Johnson was asked

---

[2] Johnson cites the second volume of the trial transcript, pages 5-9, available at ECF Doc. No. 172 at 8-12. In those pages, Officer Pajita does not say that the left side of Johnson's head was facing the wall when he fell. Nor does Officer Pajita say, as Johnson claims, that Johnson's head was 5 inches from the wall.

1  at trial whether he tried to walk away after purportedly standing back up. (Doc. No. 171 at
2  77:8-15.) Johnson did not say that he walked away. (Id.) Instead, he said, "before [he] knew
3  it [he] was on the ground flat and couldn't breathe, and that's when he found out that these
4  officers were on top of [him]." (Id.) This is not a statement about walking away. (See also
5  Doc. No. 171 at 67:2-9.) Instead, this testimony confirms that Johnson did not walk away
6  and that these events happened quickly, before anybody had time to think. This testimony
7  also corroborates Officer Pajita's story regarding the knee-pin control technique. Officer
8  Pajita reacted quickly to an attack by an unknown assailant, and the officer then took action
9  to control that assailant before he knew that the assailant was only trying to help. This was
10 a quick, instinctual response, and the Court has located no precedent "where an officer
11 acting under similar circumstances . . . was held to have violated the Fourth Amendment."
12 S.B., 2017 WL 1959984 at *6.

13       Tellingly, Johnson argues that the "most compelling testimony" came from the
14 witness who was least able to focus on the events at hand—the officer who was busy
15 arresting the bicycle thief. (Doc. No. 182 at 7.) In his prior deposition, that officer testified
16 that Johnson had started walking away on his own when Officer Blomberg arrived. (Doc.
17 No. 172 at 89:14-16.) But the video showed both Pajita and Blomberg helping Johnson off
18 the ground. (Id. at 143-44.) Johnson's counsel asked the officer whether he had seen
19 Johnson stand up before Blomberg arrived, go back down, and then get helped up by both
20 officers. (Id. at 89-94.) The officer never testified that Johnson stood up twice, and
21 Johnson's counsel did not point to any deposition testimony indicating that the officer had
22 ever testified otherwise. (Id.)

23       The officer indicated that he must have been confused as to when Johnson started
24 walking away—before Blomberg arrived or after. (Id. at 89:22-25.) The officer stated that
25 he did not see what happened specifically given that he was in the process of arresting a
26 suspect and not watching Officers Pajita and Blomberg deal with Johnson. (Id. at 90:6-8.)
27 He only saw Pajita and Blomberg interact with Johnson from his peripheral vision. (Id. at
28 141:10-13.) The officer's confusion does not implicate any clearly established

constitutional right, especially given the video evidence and the testimony from the witness inside the restaurant. Indeed, the officer's confusion is nothing compared to the inconsistencies in the testimony at issue in the S.B. case, and those inconsistencies were related to a shooting. S.B., 2017 WL 1959984 at *3. In S.B., it was not enough that the officers' testimony was inconsistent. Id. Without a clear precedent indicating that the shooting violated a clearly established right, the shooter was entitled to qualified immunity. Id. at *6-*7. The same is true in this case. Johnson has not identified any precedent that would have put these officers on notice that their conduct was contrary to clearly established constitutional rights.

Johnson points to the Court's previous order in this case, which stated that at the time of the incident, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case." (Doc. No. 182 at 10.) But that order was published before S.B. and White. Those new opinions specifically direct the Court not to analyze clearly established law as a general matter. See, e.g., S.B., 2017 WL 1959984, at *5 (The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality") (quoting City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1775–76 (2015)). Thus, Johnson cannot prevail by citing to case law that lays out general concepts without support from the trial testimony.

In lieu of identifying a specific case as required by S.B. and White, Johnson argues that the officers' conduct constituted "obvious" and "run-of-the-mill" Fourth Amendment violations. (Doc. No. 182 at 19.) But Johnson has not cited anything in the trial record that would indicate an obvious constitutional violation. Instead, the trial record makes it clear that Officer Pajita reacted quickly to a surprise attack and that Officer Blomberg arrived after Johnson sustained his injury.

In summary, the alleged conduct is not an "obvious" or "run-of-the-mill" constitutional violation, and the Court has been unable to locate a precedent where an officer, under similar circumstances, was held to have used excessive force in violation of

the Fourth Amendment. Accordingly, a reasonable jury would not have a legally sufficient basis to find that the alleged conduct violated clearly established rights. See FED. R. CIV. P. 50(a)(1); see also Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Considering all the trial testimony and the relevant law, the Court grants the motion for judgment as a matter of law as to the excessive force claim.

### B. State Law Claims

In addition to his federal excessive force claim, Johnson also asserts state law claims for negligence, battery, and intentional infliction of emotional distress. (Doc. No. 7.) Defendants ask the Court to grant them judgment as a matter of law on the negligence claim, arguing that Johnson failed to establish a causal connection between the purported negligence and Johnson's injury. (Doc. No. 181 at 6-8.)

Courts may grant judgment as a matter of law when "a party has been fully heard on an issue during a jury trial." FED. R. CIV. P. 50(a)(1). At trial, Johnson's counsel acknowledged that the trial record was complete as to the negligence claim. (Doc. No. 175 at 49:16-18.) The expert reports addressed all issues (id. at 49:1-6), and Johnson's police practices expert opined at trial on the causal connection between the officers' conduct and Johnson's injuries (Doc. No. 174 at 49:21-25). The expert testified that Officer Pajita caused Johnson's injuries by breaking with protocol to push the fleeing suspect. (Id.) But Johnson testified that he did not see Officer Pajita push the suspect and that the push had nothing to do with Johnson's decision to intervene in the chase. (Doc. No. 171 at 115:12-22.) Johnson and his experts offered no other causal theory at trial. Thus, Johnson's testimony undercut the only causal theory asserted at trial for the negligence claim. To recover for negligence, Johnson must prove a causal connection between Defendants' purportedly negligent conduct and Johnson's injury. Hayes v. County of San Diego, 57 Cal. 4th 622, 629 (2013). Johnson instead established that there was no causal connection.

Defendants challenged Johnson's causal theory in their Rule 50 motion (Doc. No. 181 at 6-8), but Johnson did not address Defendant's arguments or offer any other potential causal theory in his answer (Doc. No. 182 at 21). An argument is waived if it is not

addressed in an answering brief. <u>United States v. Orozco</u>, 858 F.3d 1204, 1210 (9th Cir. 2017) (citing <u>United States v. Gamboa–Cardenas</u>, 508 F.3d 491, [502] (9th Cir. 2007)). Thus, Johnson's testimony eliminated the only asserted causal connection between the injury and Defendants' purportedly negligent conduct, and Johnson has offered no other potential causal connection. A reasonable jury would therefore have no legally sufficient basis to find Defendants liable for negligence. <u>See</u> FED. R. CIV. P. 50(a)(1). And given that Officers Pajita and Blomberg cannot be held liable for negligence in this matter, the city cannot be held vicariously liable. CAL. GOV'T CODE § 815.2(a). The Court therefore grants Defendants' motion for judgment as a matter of law as to the negligence claim.[3]

With regards to the other state law claims, Johnson's counsel has acknowledged that if he cannot prove excessive force, then he cannot prove those claims either. (Doc. Nos. 108 at 32:1-4; 175 at 49-50.) The Court agrees, especially given that the evidence at trial was wholly against Johnson as to those claims. However, Defendants have not asked for judgment as a matter of law as to battery and intentional infliction of emotional distress. Instead, Defendants ask the Court to dismiss these claims for lack of jurisdiction. (Doc. No. 185 at 8.) A district court may decline to exercise supplemental jurisdiction if the "court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Court has original jurisdiction over the federal excessive force claim, but the Court is granting Defendants' motion for judgment as a matter of law as to that claim. The Court does not have original jurisdiction over the remaining state law claims. Thus, the Court declines to exercise supplemental jurisdiction over Johnson's claims for battery and intentional infliction of emotional distress.

## Conclusion

The Court grants the motion for judgment as a matter of law as to the federal excessive force claim against Defendants Pajita and Blomberg. The Court also grants the

---

[3] In the alternative, if the Court could not grant judgment based on the trial record, the Court would decline to exercise supplemental jurisdiction and thus dismiss the claim for lack of subject matter jurisdiction.

1  motion for judgment as a matter of law as to the state law negligence claim against
2  Defendants Pajita, Blomberg, and the City of San Diego. Because there are no remaining
3  federal claims, the Court declines to exercise jurisdiction over the remaining state law
4  claims. Accordingly, the Court dismisses the claims for battery and intentional infliction
5  of emotional distress.

6  **IT IS SO ORDERED.**

7  DATED: August 3, 2017

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT